**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**R. DANNY HUNTINGTON,**

  **Plaintiff,**

   **v.**                                             **Civil Action No. 15-2249 (JEB)**

**U.S. DEPARTMENT OF COMMERCE,**

  **Defendant.**

---

<u>**MEMORANDUM OPINION**</u>

Plaintiff R. Danny Huntington, an intellectual-property attorney, wants to know more about a recently scrapped confidential program of the U.S. Patent and Trademark Office (USPTO) to flag certain patent applications as involving particularly sensitive subject matter. He believes that applications pulled into the secret program's ambit were kept pending far longer than those permitted to proceed normally. <u>See</u> ECF No. 11-2 (Declaration of R. Danny Huntington), ¶ 17. In pursuit of his suspicions, Huntington submitted several Freedom of Information Act requests to the USPTO, a component of Defendant U.S. Department of Commerce. After the USPTO searched for responsive records, produced some, and withheld others, Plaintiff administratively appealed and eventually filed suit here. Both sides now move for summary judgment. The Court concludes that an issue of material fact exists as to whether Defendant conducted adequate searches, but it finds that the USPTO did appropriately withhold responsive documents under FOIA Exemption 5. The Court will, therefore, largely deny each party's Motion.

1

I.      **Background**

In the typical process, a patent application submitted to the USPTO is assigned to a patent

examiner in one of nine Technology Centers, each of which deals with a particular area of

technology.  See ECF No. 14-4 (Declaration of John Ricou Heaton), ¶ 19.  The patent examiner

assesses the application and reviews it for compliance with legal requirements.  Id.  If they are

met, the USPTO will grant the patent by issuing a Notice of Allowance.  Id., ¶¶ 19-20.

In 1994, the Office introduced a new program called the Sensitive Application Warning

System (SAWS), which "allow[ed] patent examiners to alert leadership when a patent might

issue on a sensitive matter."  Id., ¶ 21.  The SAWS program "was integrated" into the regular

patent-application review process: upon receiving an application for review, a patent examiner

considered whether it should be included in the program based on "subject matter criteria" that

varied by Technology Center.  Id.  Such criteria included, for example, whether the application

"would potentially generate unwanted media coverage"; had "pioneering scope"; was "[s]illy or

extremely basic"; posed a danger to individuals, the environment, or national security;

"appear[ed] to violate the laws of chemistry or physics"; involved "[c]ontroversial, [i]llegal,

objectionable, or derogatory subject matter"; or specifically invoked race.  See ECF No. 11-4,

Exh. 2-3 at B-89.

Inclusion in the SAWS program did not itself determine whether a patent application

would ultimately be granted or denied.  See ECF No. 18 (Supplemental Declaration of John

Ricou Heaton), ¶ 9.  It could, however, trigger "an internal quality assurance check," which

would be conducted using "the same substantive standards of patentability as all other

applications."  Heaton Decl., ¶ 22.  If an application referred to the SAWS program was

ultimately granted by a patent examiner, before a Notice of Allowance would be mailed to the

applicant, the USPTO would prepare a SAWS report that described the invention and explained

why the application was considered sensitive.  Id.  The report would be forwarded to a

Technology Center Director, who would decide whether the Commissioner for Patents Office

should be notified.  Id., ¶¶ 19, 22.  That an application had been flagged for SAWS review was

never disclosed to the applicant or the public, as the agency believed that doing so risked

coloring the public's view of the application and giving rise to "unjustified inferences as to the

issued patent's strength and weakness."  Id., ¶ 22 (citation omitted).

The USPTO retired the SAWS program in March 2015.  Id.  Approximately 0.04% of the

total number of patent applications filed were referred to the SAWS program during its

operation.  Id., ¶ 21.

During the first half of 2015, Huntington submitted several FOIA requests to the USPTO

seeking records related to the SAWS program.  He submitted the first such request — assigned

Request No. F-15-00107 and referred to by the parties as R1 — in February 2015.  See ECF No.

11-4, Exh. 2-1.  That request sought: (1) the biannual SAWS update, including documents

relating to any SAWS procedures and statutory bases for the program; (2) documents "directing,

instructing, or specifying the action(s) to be taken upon receiving a notification that 'an

allowance of a SAWS application is mistakenly mailed prior to the SAWS report'"; (3)

information pertaining to complete SAWS reports; and (4) information pertaining to forwarded,

non-forwarded, and removed SAWS reports.  Id.  In response, the USPTO released to Plaintiff

118 pages of responsive documents, some portions of which were redacted pursuant to

Exemption 5.  Id., Exh. 2-2 at B002.  Huntington then filed an administrative appeal, which the

USPTO denied.  Id., Exhs. 2-3, 2-4.

In April 2015, Huntington submitted three additional FOIA requests.  <u>See</u> ECF No. 11-5,

Exhs. 3-1, 3-2, 3-3.  The USPTO consolidated them into one request, assigned Request No. F-

15-00190.  <u>See</u> Heaton Decl., ¶ 9-10.  The first portion (R3) sought certain information on patent

applications designated, flagged, or grouped under the SAWS program, including their filing

dates.  <u>See</u> ECF No. 11-5, Exh. 3-1.  (The identifier R2 never appears in the record.)  The second

portion (R4) sought "manuals, instructions, training material, screen-shots, or records" relating to

"the 'flagging' and 'unflagging' of SAWS Applications" and "the exportation of data or

generation of reports pertaining to SAWS Applications"; "records, reports, or emails providing

summary reports . . . on SAWS applications by Technology Centers"; and, separated by

Technology Center, information on SAWS applications for applicants claiming micro-entity,

small-entity, and large-entity status.  <u>Id.</u>, Exh. 3-2.  Finally, the third portion (R5) sought "all

communication records concerning Kimberly Jordan becoming the Board [of Patent Appeals']

SAWS Point of Contact"; "all communications, letters, memoranda, or emails concerning the

SAWS program sent to the Board's personnel including to Administrative Patent Judges . . .

since 1994 which contain any alerts to the SAWS program or explanations or instructions for

how APJs should use or consider SAWS flag information or the SAWS memoranda"; and "all

post-decisional communications, letters, memoranda, or emails concerning the retirement of the

SAWS program or instructions . . . of tasks and procedures for terminating or winding down the

SAWS program."  <u>Id.</u>, Exh. 3-3.

Upon receiving Request No. F-15-00190, the USPTO informed Huntington that the

processing fees would be approximately $5,307.55.  <u>Id.</u>, Exh. 3-4 at 1.  Plaintiff pledged to pay

$250 to cover the cost of R3 and asked for a breakdown of the fees for R4 and R5.  <u>Id.</u>, Exh. 3-6.

In July 2015, the USPTO issued a final response letter to Huntington for R3, explaining that it

had located responsive records but was withholding them in full pursuant to Exemption 5.  Id.,

Exh. 3-8.  Plaintiff filed an administrative appeal, which was denied.  Id., Exhs. 3-9, 3-10.  He

then sent another letter to the USPTO's FOIA Office, explaining that he remained interested in

his R4 and R5 requests.  Id., Exh. 3-11.   The USPTO subsequently designated those requests

No. F-16-00037.  See ECF No. 1 (Complaint), ¶ 32.

 After several months of back-and-forth correspondence between the parties, Plaintiff

filed the present action in December 2015, alleging Defendant had failed both to conduct an

adequate search and to produce responsive records.  See Complaint, ¶¶ 34-43.  The USPTO then

undertook "a more thorough subsequent search," Heaton Decl., ¶ 23, and, via six different

response letters, released 4,114 pages and five spreadsheets of material, of which one document

was redacted in full and 132 pages of 59 documents were redacted in part pursuant to

Exemptions 3, 5, and 6.  Id., ¶¶ 44-50.

 Contending that Defendant's search remains inadequate and that certain records were still

improperly withheld, Huntington moved for summary judgment.  See ECF No. 11 (Pl. Mot.).

Defendant, conversely, believes it has satisfied its FOIA obligations and thus cross-moved for

summary judgment.  See ECF No. 14 (Def. Mot.).  Those Motions are now ripe.

## II.    Legal Standard

 Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott

v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248.  "A party asserting that a

fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts

of materials in the record" or "showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact." Fed. R. Civ. P. 56(c)(1). The moving party bears the burden of demonstrating

the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986). In the event of conflicting evidence on a material issue, the Court is to construe the

conflicting evidence in the light most favorable to the non-moving party. See Sample v. Bureau

of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

FOIA cases typically and appropriately are decided on motions for summary judgment.

See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). In a FOIA case, a

court may grant summary judgment based solely on information provided in an agency's

affidavits or declarations when they "describe the justifications for nondisclosure with

reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)

(citation omitted). "Unlike the review of other agency action that must be upheld if supported by

substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on

the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"

Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989)

(quoting 5 U.S.C. § 552(a)(4)(B)).

## III.    Analysis

Congress enacted FOIA in order "to pierce the veil of administrative secrecy and to open

agency action to the light of public scrutiny." Dep't of the Air Force v. Rose, 425 U.S. 352, 361

(1976) (quotation marks and citation omitted).  "The basic purpose of FOIA is to ensure an

informed citizenry, vital to the functioning of a democratic society, needed to check against

corruption and to hold the governors accountable to the governed."  John Doe Agency v. John

Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).  The statute provides that "each agency,

upon any request for records which (i) reasonably describes such records and (ii) is made in

accordance with published rules . . . shall make the records promptly available to any person."  5

U.S.C. § 552(a)(3)(A).  Consistent with this statutory mandate, federal courts have jurisdiction to

order the production of records that an agency improperly withholds.  See id. § 552(a)(4)(B);

Reporters Comm., 489 U.S. at 754-55.  "At all times courts must bear in mind that FOIA

mandates a 'strong presumption in favor of disclosure.'"  Nat'l Ass'n of Home Builders v.

Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502 U.S. 164, 173

(1991)).

     In the course of their briefing, the parties have helpfully narrowed the issues in this

dispute to two: (1) the adequacy of the USPTO's search for responsive records, and (2) the

propriety of its withholding certain records in whole or in part pursuant to Exemption 5.  In other

words, Plaintiff no longer challenges the applicability of Exemptions 3 or 6 to any of the records

at issue.  Compare Pl. Mot. at 1 n.1, with ECF No. 15 (Pl. Opposition) at 1 n.1.  In addition, the

Court considers only the specific challenges Plaintiff raises to Defendant's search.

     Although the Department of Commerce also contends that it is not the proper Defendant

in this action, and that Huntington should instead have sued the USPTO, it only raised that

argument in a brief footnote and failed to discuss it in its Reply.  See Def. Mot. at 1 n.1.  The

Court thus considers the issue forfeited.  Gold Reserve Inc. v. Bolivarian Republic of Venezuela,

146 F. Supp. 3d 112, 126-27 (D.D.C. 2015) (holding "obliquely" raising issue in footnote

insufficient to surmount waiver threshold); see also Hutchins v. Dist. of Columbia, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc) (explaining courts "need not consider cursory arguments made only in a footnote"); Johnson v. Panetta, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[P]erfunctory and underdeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived.").  The Court now addresses in turn the two issues before it.

    A.  Adequacy of Search

    "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  Valencia-Lucena v. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)); see also Steinberg v. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994).  The adequacy of an agency's search for documents under FOIA "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."  Weisberg v. Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984).  Adequacy "is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."  Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003) (emphasis added) (citation omitted).

    To meet its burden, the agency may submit affidavits or declarations that explain the scope and method of its search "in reasonable detail."  Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982).  The affidavits or declarations should "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials (if such records exist) were searched."  Oglesby v. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  Without contrary evidence, such affidavits or declarations are sufficient to show that an agency complied with FOIA.  See id.  On the other hand, if the record "leaves substantial doubt as to the

sufficiency of the search, summary judgment for the agency is not proper." Truitt, 897 F.2d at 542.

To establish the sufficiency of its search here, Defendant submitted two declarations from John Ricou Heaton, who serves as an Associate Counsel for the Office of General Law and a FOIA officer at the USPTO.  See Heaton Decl., ¶ 1.  Heaton explains the steps the USPTO took to search for responsive records.  First, in response to F-15-00107 (R1) and F-15-00190/F-16-0037 (R4, R5), the agency identified the Office of the Commissioner for Patents, eleven of its subordinate offices, and the Office of the Deputy Commissioner for Patent Examination Policy "as being reasonably likely to have records responsive to both of these requests."  Id., ¶ 23.  Heaton describes the responsibilities of those offices as they related to the SAWS program and states that personnel searched a SharePoint site created as "a repository of SAWS-related documentation for all of the [Technology Centers]," "dedicated folders for SAWS-related emails . . . or documents" on work laptops, a "Shared network drive," and paper files.  Id., ¶¶ 23-33.  All of the electronic files were searched using certain keywords.  Id.

In response to Huntington's Request F-15-00190 seeking a list of filing dates for SAWS applications (R3) and the numbers of SAWS applications that had been issued, abandoned, or were pending by entity status (R4), Defendant "contact[ed] staff at the Patent Planning and Data Analysis office" to obtain records from the Patent Application Locating and Monitoring System (PALM).  Id., ¶ 34.  In addition to providing background on how the USPTO used PALM to track flagged applications, Heaton explains that lists of filing dates were pulled for the end of fiscal year 2010 and March 2, 2015, but were not pulled for the earlier years Huntington requested because PALM did not retain such data prior to April 2010.  Id., ¶¶ 35-37.

As to Huntington's request for records relating to the flagging and unflagging of SAWS applications (R4), the exportation of data or generation of reports pertaining to SAWS applications (R4), Kimberly Jordan's becoming the SAWS point of contact at the Patent Trial and Appeal Board (R5), and communications to Patent Trial and Appeal Board (PTAB) personnel about how administrative patent judges should use or consider SAWS flag information (R5), Defendant searched within the Office of Patent Information Management (OPIM) and the PTAB because they "were identified as offices reasonably likely to have responsive records." Id., ¶ 39.  OPIM "staff identified two internal websites, one a repository of information used by OPIM staff and the other a PALM Management Report website, along with an OPM staff member's emails, as locations where SAWS records would be stored electronically," and searched them using certain terms.  Id., ¶ 40.  They "did not identify any paper files as locations where SAWS-related records would be stored."  Id.  PTAB staff used the same terms to search work laptops and emails, and similarly identified no paper files.  Id., ¶ 41.

Finally, in an additional search for records related to R1, Defendant contacted the Cyber Security Investigations (CSI) Office to see if it maintained any electronic records for specific employees who had been involved with SAWS before leaving the USPTO because CSI "maintains emails and/or documents for some departing employees."  Id., ¶ 43.  CSI had some memos, emails, and imaged copies of documents from work laptops and network drives, which were searched with key terms.  Id.

In assessing whether Defendant has "demonstrate[ed] beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents,'" and thus has "fulfill[ed] its obligations under FOIA," Valencia-Lucena, 180 F.3d at 325 (quoting Truitt, 897 F.2d at 542), the Court considers the three issues Huntington raises: (1) whether the agency's account of its

search is facially flawed; (2) whether the search suffers from specific deficiencies; and (3) whether countervailing evidence demonstrates that the scope of the search was too narrow.

        1.  *Facial Deficiency*

        Although Heaton's declarations span forty pages, not including exhibits, and include a commendable amount of detail, the Court is constrained to conclude that the agency's account of its search is nonetheless facially flawed.  To satisfy the dictates of FOIA, the Department must, at a minimum, "aver that it has searched <u>all</u> files likely to contain relevant documents." <u>Am. Immigration Council v. Dep't of Homeland Sec.</u>, 21 F. Supp. 3d 60, 71 (D.D.C. 2014) (quoting <u>Am. Immigration Council v. Dep't of Homeland Sec.</u>, 950 F. Supp. 2d 221, 230 (D.D.C. 2013)) (emphasis added).  As the D.C. Circuit explained in <u>Oglesby</u>, while an agency need not search every one of its record systems, a "reasonably detailed affidavit . . . averring that all files likely to contain responsive materials . . . were searched[] is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment."  920 F.2d at 68.

        "Where the government has not made such an attestation, courts have typically found that an issue of material fact exists as to the adequacy of the search." <u>Am. Immigration Council</u>, 21 F. Supp. 3d at 71 (internal quotation marks and citation omitted).  In <u>Jefferson v. Bureau of Prisons</u>, No. 05-848, 2006 WL 3208666 (D.D.C. Nov. 7, 2006), for example, the court found the FBI's search inadequate because its declaration did not "aver that the FBI searched all files likely to contain responsive records."  <u>Id.</u> at *6; <u>see also</u> <u>Bonaparte v. Dep't of Justice</u>, 531 F. Supp. 2d 118, 122 (D.D.C. 2008) (same); <u>Maydak v. Dep't of Justice</u>, 362 F. Supp. 2d 316, 326 (D.D.C. 2005) (same).

Here, similarly, Defendant has failed to invoke "the 'magic words' concerning the adequacy of the search — namely, the assertion that [the Department] searched all locations likely to contain responsive documents." Bartko v. Dep't of Justice, 167 F. Supp. 3d 55, 64 (D.D.C. 2016).  It has stated only that it "identified offices reasonably likely to have responsive information and those offices conducted a reasonable search for responsive records."  Def. Mot. at 16; see also Heaton Decl., ¶ 75 ("[T]he USPTO conducted a search of the offices reasonably likely to have the records sought by all of these request indices . . . .").  Such attestations may come close, but they ultimately do not pass muster.  See Oglesby, 920 F.2d at 68 (finding search deficient notwithstanding agency's assertion that "a search was initiated of the Department record system most likely to contain the information which had been requested"); Am. Immigration Council, 21 F. Supp. 3d at 71 (deeming declaration inadequate despite agency's claim that it searched the offices "most likely to possess records responsive to [Plaintiff's] request").

In the absence of an affidavit containing the specific assertion that the USPTO searched all locations likely to contain responsive documents, the Court must conclude that a genuine issue of material fact remains as to whether the agency's efforts were sufficient.

> ### 2.  *Specific Objections*

Huntington also raises multiple specific objections to Defendant's search.  Although the Court is denying summary judgment on the ground just explained, it believes that a discussion of these objections may provide guidance to the parties for their next round.

Plaintiff first contends that, although Defendant states that emails in various offices were searched, see Heaton Decl., ¶¶ 28-31, 33, 40-41, 43, it does not explain whether such searches were done on individual computers or an agency email system, or how the agency email system

is structured, including whether emails can be archived and subsequently searched or destroyed. See Pl. Opp. at 3.  Heaton, however, rectifies this omission in his supplemental declaration.  See Suppl. Heaton Decl., ¶ 6 (explaining how USPTO stores and accesses email files, and clarifying "no separate archived version of emails" exists).  Heaton likewise responds to Huntington's note that the agency did not disclose "the time periods covered by the records searched."  Pl. Opp. at 3; Suppl. Heaton Decl., ¶ 3 (offices used dates set forth in Plaintiff's requests to conduct searches).

Huntington next asserts that Defendant offers "no discussion of how any other records are archived by the PTO."  Pl. Opp. at 3.  He speculates that because the SAWS program was established in the mid-1990s, "[t]he computers, servers and other electronic systems used by the PTO today are not likely to retain all responsive documents," and he faults the agency for failing to "discuss what happened to these older records, how they were archived and if they were ultimately destroyed," and "what happened to hard drives from computers no longer being used that would have maintained responsive records."  Id.  But the "'presumption of good faith'" accorded to an agency's affidavits and declarations describing its search "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).  Huntington may hypothesize, for example, that the USPTO lacked electronic systems in the mid-1990s and has not digitized its paper records from that time, or that it had electronic records systems but the records stored therein were not transferred to more current systems.  Yet he offers no evidence to support those or other suppositions.  Without any evidence that the USPTO's current electronic systems do not contain older records, the Court will not require the agency to describe documents, systems, or

equipment that may or may not have once existed and their status now, nor will it infer

inadequacy from the absence of such information in Defendant's declarations.

Additionally, Plaintiff points out that the declarations omit the names, positions, and

subject-matter expertise of the staff members who conducted the search, as well as "signed

search logs or other documentation . . . to corroborate the purported searches made by staff

members." Pl. Opp. at 3. The Court, however, is unsure why the identities or backgrounds of

the personnel executing the search is of use to Plaintiff, see Leopold v. CIA, 177 F. Supp. 3d

479, 491 (D.D.C. 2016), and he provides no authority — nor is the Court aware of any — to

support the argument that an agency must supply such information or include signed search logs.

Next, and more fruitfully, Huntington identifies several ways in which Defendant's

description of its search lacks the requisite specificity. He first focuses on Heaton's description

of the search undertaken in the Office of Patent Training:

> [P]ersonnel identified a Shared network drive and work laptops and
> emails as locations where SAWS records would be stored
> electronically. No paper files were identified as being a location
> where SAWS material would be located. The Shared network drive,
> work laptops, and emails were searched with the keyword "SAWS"
> and a dedicated SAWS folder on the Shared drive was also searched.

Heaton Decl., ¶ 30. The Court agrees that this account does not constitute "[a] reasonably

detailed" description of "the type of search performed." Oglesby, 920 F.2d at 68. It leaves open

to question how many work laptops and emails were searched, why those locations but not others

were thought to be reasonably likely to contain responsive records, and how the agency

concluded that no paper files had responsive records. Cf. Wright v. Admin. for Children &

Families, 2016 WL 5922293, at *7 (D.D.C. Oct. 11, 2016) (concluding agency "sufficiently

described the manner in which email accounts were searched, noting," inter alia, number of

mailboxes searched and to whom they belonged). Heaton's declaration is similarly vague as to

email searches undertaken in the nine Technology Centers, the Office of Patent Legal

Administration, the Office of Patent Training, the Office of the Deputy Commissioner for Patent

Examination Policy, and the Patent Trial and Appeal Board.  See Heaton Decl., ¶¶ 29-30, 33, 41;

Pl. Opp. at 5-6.  Although the declaration states that certain personnel in each office searched

their emails, it does not make clear how many personnel did so, what their positions were, or

why those accounts were searched but others were not.  "Without any further information on the

search regarding these [records], the Court cannot conclude that it 'was reasonably calculated to

uncover all relevant documents.'"  Elkins v. Fed. Aviation Admin., 99 F. Supp. 3d 90, 97

(D.D.C. 2015) (quoting Valencia-Lucena, 180 F.3d at 325).

Huntington raises one final issue, which requires some background explanation.  In

response to the requests for a list of filing dates for SAWS applications and the numbers of

SAWS applications, Defendant explains that responsive records were obtained from the Patent

Application Locating and Monitoring System (PALM), which the USPTO uses "for the retrieval

and/or online updating of each patent application."  Heaton Decl., ¶ 35.  That system works as

follows: Within PALM, a patent application can be given a temporary flag or "placed into a

'grouping,' which is a more permanent record."  Id.  Once a temporary flag is changed or

removed, PALM does not retain any information about the flag.  Id.  In contrast, when an

application is placed into a grouping, PALM does keep information about that grouping even if

the application is later removed from the grouping or the grouping is abolished.  Id.

In April 2010, the USPTO began tracking SAWS applications in PALM by putting them

into a grouping.  Id., ¶ 36.  Previously, SAWS applications were tracked only with temporary

flags.  Id.  PALM thus can be used, Heaton explains, to electronically generate lists of SAWS

applications, including their filing dates, from the end of fiscal year 2010 onward.  Id.  Defendant

thus produced the requested lists for 2010 and 2015, but asserts it cannot do not so for the earlier

years because there was no electronic or centralized list of SAWS applications until the USPTO

began tracking them with a grouping in PALM.  Id., ¶¶ 37-38.

Huntington, however, had sought a list of filing dates for SAWS applications pending at

the end of fiscal years 1998, 2002, 2006, 2010, and March 2, 2015.  See ECF No. 11-5, Exh. 3-1.

His qualm with the agency's explanation for its failure to produce lists for 1998, 2002, and 2006

is that the USPTO "does not assert that there are no archived versions of the PALM database that

would still contain snapshot images of the PALM database with the flags active at the time of the

snapshot and therefore provide responsive information."  Pl. Opp. at 6-7.  Heaton, however,

asserts exactly that in his supplemental declaration.  The PALM database is periodically backed

up with tapes, which are kept for sixty days and then erased for reuse.  See Suppl. Heaton Decl.,

¶ 7.  "[T]here is no separate 'archived' version of PALM as it existed in 2010 or some date prior

to that."  Id.  Contrary to Plaintiff's argument, then, "[t]he failure to search archived versions of

the PALM database" — which do not exist — does not "render[] the search for these records

inadequate."  Pl. Opp. at 7.

In sum, although the majority of Huntington's specific objections to the agency's claim to

have conducted an adequate search fall flat, the Court agrees that in some respects Defendant

failed to proffer a reasonably detailed description of the search.  This should offer some

assistance to both sides going forward.

### 3.  *Countervailing Evidence*

Finally, Plaintiff recounts several categories of records he expected to be found in

response to his FOIA requests but in fact were not.  See Pl. Mot. at 13-20.  In general, identifying

a handful of documents that an agency fails to uncover does not, in itself, demonstrate that a

search was inadequate.  See Boyd v. Dep't of Justice, 475 F.3d 381, 391 (D.C. Cir. 2007)

("[T]he fact that a particular document was not found does not demonstrate the inadequacy of a

search."); Wilbur v. CIA, 355 F.3d 675, 678 (D.C. Cir. 2004) ("[T]he agency's failure to turn up

a particular document . . . does not undermine the determination that the agency conducted an

adequate search for the requested records.").  The "adequacy of a FOIA search is generally

determined not by the fruits of the search, but by the appropriateness of the methods used to

carry out the search.  After all, particular documents may have been accidentally lost or

destroyed, or a reasonable and thorough search may have missed them."  Iturralde, 315 F.3d at

315 (citations omitted); see Porter v. CIA, 778 F. Supp. 2d 60, 69 (D.D.C. 2011).

Nor is the government required to examine every document that is merely cross-

referenced by the records that have been reviewed.  In Steinberg, the plaintiff complained that

the government had not examined six files that were mentioned in several disclosed documents.

See 23 F.3d at 552.  The D.C. Circuit held that FOIA does not require agencies to track down

every cross-referenced record in the documents it examines: "[M]ere reference to other files does

not establish the existence of documents that are relevant to appellant's FOIA request."  Id.

Courts admittedly have sometimes found that the government's failure to hand over

specific documents indicates that a search was inadequate.  But these cases tend to involve

instances where the existence of a given document indicates that the agency failed to search a

particular category of files or a particular department's records.  For instance, in Wolf v. CIA,

357 F. Supp. 2d 112 (D.D.C. 2004), rev'd in part on other grounds, 473 F.3d 370 (D.C. Cir.

2007), the plaintiff sought all documentation in the FBI's possession regarding the activities of a

particular political figure.  Id. at 114.  The plaintiff independently produced an internal FBI

memorandum indicating that the individual's case file was being closed and that his subsequent

activities would be reported in a file called "Political Situation in Colombia — Foreign Political

Matter." Id. at 119.  The court agreed that the FBI should have searched this "Political

Situation" file and that the agency's failure to do so rendered summary judgment improper.

Id.  Likewise, in Campbell v. Department of Justice, 164 F.3d 20 (D.C. Cir. 1998), the files that

the FBI provided in response to plaintiff's FOIA request alluded to records contained in two

additional record systems, an electronic-surveillance index and "tickler" files. Id. at 27.  The

court thus held that the FBI should have searched those additional record systems. Id. at 28; see

Iturralde, 315 F.3d at 315 (failure to disclose particular document only indicates

inadequate search under certain circumstances — e.g., the government "failed

to search particular offices or files where the document might well have been found"; "failed or

refused to interview government officials for whom there was strong evidence that they might

have been helpful in finding the missing documents"; or "ignored indications in documents

found in its initial search that there were additional responsive documents elsewhere") (citations

omitted).

Unlike the documents discussed in Wolf and Campbell, most of the records that Plaintiff

refers to here do not constitute countervailing evidence sufficient to show that the search was

inadequate.  Huntington first contends that previously released documents demonstrate that

Defendant did not adequately search for records relating to semiannual SAWS guidelines.  See

Pl. Mot. at 16.  He presents evidence in the form of a table showing that, while Defendant

produced very few memos, reminders, or updates related to the guidelines for most of the

Technology Centers prior to 2008, it produced such records for almost every Technology Center

for each year spanning 2008 to 2014.  See ECF No. 11-8, Exh. 6-1.  The dearth of pre-2008

records, he contends, is inconsistent with a 2002 memo from the Deputy Commissioner for

Patent Operations to patent examiners stating, "Each Technology Center will distribute a SAWS memo to examiners at least semi-annually," ECF No. 11-4, Exh. 2-3 at B-72, and emails from 2010 onward indicating that SAWS guidelines should be updated semiannually.  See ECF No. 11-8, Exh. 6-2.  This evidence, however, does not reveal a particular category of files or a particular department whose records the agency failed to search.  On the contrary, the table shows that the agency did structure its search to locate semiannual SAWS guidelines across Technology Centers because it produced some pre-2008 records from more than one Technology Center.  The table also shows that more records dated after 2002 were produced — though not as many as were dated from 2008 on — which is not inconsistent with the memo to which Huntington refers.  That fewer records from certain Technology Centers in certain years were produced than Plaintiff anticipated could reasonably be because those records were lost, missed in an otherwise adequate search, or never created in the first place.

Huntington next complains that the USPTO located "[l]ittle responsive material" to his request for "specific items about the preparation of SAWS report."  Pl. Mot. at 16.  He observes that while "'templates' from certain years were ultimately produced, no written guidelines for 'impact' criteria for examiners to make the 'Impact Statement' were produced," and he hypothesizes that "written guidelines would be necessary to make the impact statement."  Id. at 17.  He likewise laments that "[v]irtually little or no material at all was produced" regarding his requests for "TC Directors' decision factors regarding disposition of SAWS applications" or for procedures or information on the factors, considerations, and decisions made at the USPTO.  Id. He points to two emails from 2010 and 2015 that refer to moving along old SAWS cases and removing certain categories from the list of criteria triggering SAWS designation, see ECF No. 11-10, Exh. 8, and a 2008 memo and 2015 email referring to the flagging of SAWS applications

in PALM, see ECF No. 11-9, Exh. 7, to suggest that more documents exist and should have been produced. Again, such sporadic evidence and speculation about what might exist does not constitute countervailing evidence sufficient to demonstrate an inadequate search.

Plaintiff does, though, successfully present countervailing evidence regarding one aspect of Defendant's efforts. As to the search of work laptops and emails at the Patent Trial and Appeal Board, see Heaton Decl., ¶ 41, Huntington protests that Heaton's declaration fails to state "whether the Chief Judge's records and computers were searched at all," Pl. Opp. at 6, and notes that documents relating to the Board's handling of SAWS information exist but were not produced. See Pl. Mot. at 18.

Heaton clarifies in his supplemental declaration that because PTAB Chief Judges "were not reasonably likely to have records responsive to Plaintiff's FOIA requests," their records and computers were not searched. See Suppl. Heaton Decl., ¶ 4. He supports that conclusion with an email from December 2014 between PTAB judges stating, "We are not aware of the SAWS flag when we receive the appeal, nor during processing, deliberations, or decision writing." Heaton Decl., Exh. W.

That email, however, is at odds with earlier emails submitted by Huntington that suggest that SAWS reports were in fact sent to the Board of Patent Appeals and Interferences (the precursor to the PTAB, see 37 C.F.R. §§ 42.1-42.80; 26 Paul M. Coltoff *et al.*, Federal Procedure, Lawyer's Edition § 60:474 (2016)), and that the Board was to be alerted when an appeal involved a SAWS application. See ECF No. 11-12, Exh. 10 at 1 ("We've gotten some questions as to whether all reexams and all cases going to the BPAI need a report. The intent is only those meeting the listed SAW criteria need a report prepared and forwarded."); see id. at 2

("Update on what the Board needs in regard to SAWS applications: . . . email that it is considered a SAWS application . . . .").

Given this apparent conflict, the Court cannot accept Heaton's effort to defeat Plaintiff's objection. Instead, it must conclude that Defendant should have searched the PTAB Chief Judge's records and computers. This should be accomplished before further briefing takes place.

B. Exemption 5

Given the long discussion of adequacy, the reader may be forgiven for having forgotten that there is yet another issue to tackle: whether Defendant properly withheld some recovered records pursuant to FOIA Exemption 5.

This exemption applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In other words, under Exemption 5, an agency may withhold from a FOIA requestor any "documents[] normally privileged in the civil discovery context." NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 149 (1975); see also United States v. Weber Aircraft Corp., 465 U.S. 792, 799 (1984). This exemption thus encompasses three distinct categories of information: deliberative-process privilege, attorney-work-product privilege, and attorney-client privilege. See Am. Immigration Council v. Dep't of Homeland Sec., 905 F. Supp. 2d 206, 216 (D.D.C. 2012). In the present case, Defendant asserts that portions of the contested documents should be withheld under this exemption because they are covered by the deliberative-process privilege.

That particular privilege is intended "to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 9 (2001) (internal quotation marks and citation omitted). The privilege "rests on the obvious realization that

officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." Id. at 8-9; see also Dow Jones & Co. v. Dep't of Justice, 917 F.2d 571, 573-74 (D.C. Cir. 1990).  The deliberative-process privilege thus permits the "withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be." Sears, 421 U.S. at 153 (internal quotations omitted).

To justify a withholding under this privilege, the government must prove two basic elements.  First, it must demonstrate that a document qualifies as "pre-decisional" in the sense that it was "[a]ntecedent to the adoption of an agency policy." Jordan v. Dep't of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc), partially overruled on other grounds by Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1053 (D.C. Cir. 1981) (en banc). Second, the government must show that the document forms "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." Vaughn v. Rosen, 523 F.2d 1136, 1144 (D.C. Cir. 1975); see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget, 598 F.3d 865, 876 (D.C. Cir. 2009) (explaining that "[a] document that does nothing more than explain an existing policy cannot be considered deliberative").

The USPTO asserted Exemption 5 with respect to 49 documents. See Def. Mot. at 21; Heaton Decl., ¶ 55.  It has since released three of those documents in full, mooting any challenge to those few. See ECF No. 18 (Def. Reply) at 9; Suppl. Heaton Decl., ¶ 13.  Of the remaining 46, fifteen are internal emails and memos that were redacted in part to conceal "pre-decisional discussions about proposed agency actions with respect to the SAWS or other agency programs." Heaton Decl., ¶ 60.  Those emails and memos discussed, for example, potential changes to SAWS subject-matter guidelines and program guidance, the impact of a recent court decision on

the SAWS program, and the implications of FOIA for SAWS.  See Suppl. Heaton Decl.,

¶ 11.  The other 31 documents consist of training presentations about the SAWS program, notes

for a training presentation, lists of patent-application filing dates organized by Technology

Center, and emails and attachments sent among patent examiners, SAWS program managers,

Technology Center employees, and senior USPTO officials.  See Heaton Decl., ¶¶ 55, 57-58 &

Exh. T (Vaughn Index).  This latter group of documents was redacted in whole or in part to

conceal the application numbers of applications flagged for SAWS and information about

specific patent applications that were or should have been flagged for SAWS.  Id.

Huntington challenges the application of the deliberative-process privilege to all of these

documents.  See Pl. Opp. at 9-21.  His primary argument is that a decision to flag an application

for the SAWS program and an application's status as flagged or unflagged are not predecisional

or deliberative because whether an application is flagged does not itself determine whether the

patent will be allowed.  See id. at 9-13.

That view of the privilege is too narrow.  Although flagging an application for the SAWS

program is not dispositive as to whether the patent will be allowed, it can trigger an additional

internal quality-assurance check, the result of which "could have an impact on the ultimate

decision by the patent examiner."  Suppl. Heaton Decl., ¶ 9; see also id., ¶ 8; Heaton Decl.,

¶¶ 22, 54.  The challenged documents precede the final patentability decision and are part of the

process by which that decision is made; they therefore are predecisional and deliberative.  See

Abtew v. Dep't of Homeland Sec., 808 F.3d 895, 898 (D.C. Cir. 2015) ("A document is

'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates.") (quoting

Senate of the Commonwealth of Puerto Rico v. Dep't of Justice, 823 F.2d 574, 585 (D.C. Cir.

1987)); id. at 899 ("[A] document is deliberative if it is 'a part of the agency give-and-take — of

the deliberative process — by which the decision itself is made.") (quoting <u>Vaughn</u>, 523 F.2d at 1144); <u>Nat'l Sec. Archive v. CIA</u>, 752 F.3d 460, 463 (D.C. Cir. 2014) ("The term 'deliberative' in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue.").

Taking a slightly different tack, Huntington also argues that the USPTO "failed to demonstrate an interest protectable under the FOIA." Pl. Opp. at 14. But the agency's desire to avoid generating public bias toward patents that had been selected for the SAWS program is directly in line with one of the purposes of the deliberative-process privilege. <u>See, e.g.</u>, <u>Defenders of Wildlife v. Dep't of Agriculture</u>, 311 F. Supp. 2d 44, 57 (D.D.C. 2004) ("[S]pecific policy objective[] underlying this privilege [is] . . . to protect against public confusion that might result from disclosure of reasons and rationale that were not in fact ultimately the grounds for an agency's action.").

Last, Plaintiff contends that Defendant's basis for withholding in full a document listing the filing dates of applications included in the SAWS program — that their release would enable identification of applications filed on low-volume days, <u>see</u> Suppl. Heaton Decl., ¶ 12 — is too speculative. <u>See</u> Pl. Opp. at 19-20. Not so. As Heaton explains in his supplemental declaration, between fiscal year 2010 and the present, there have been 402 days on which individual Technology Centers received only one patent application, 592 days on which they received only two, and 1,395 days on which they received only three or four. <u>See</u> Suppl. Heaton Decl., ¶ 12. As the filing dates and Technology Center for published patent applications are publicly available, including online, <u>id.</u>, it is far from speculative that the withheld document could be used to identify patents flagged for the SAWS program prior to allowance.

Having concluded that Plaintiff's aforementioned challenges to the records withheld pursuant to Exemption 5 fail, the Court need not address Defendant's related argument that this exemption also applies here because discussions and decisions about the scope of the SAWS program and the statuses of particular applications are undertaken in patent examiners' quasi-judicial capacity.  <u>See</u> Def. Mot. at 18.

## IV.     Conclusion

For the foregoing reasons, the Court will grant Plaintiff's Motion in part and deny it in part, and will grant Defendant's Motion in part and deny it in part.  The Court will issue a contemporaneous Order so stating and requiring consultations between the parties for a further briefing schedule.

<u>/s/ *James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>January 18, 2017</u>