**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **R. DANNY HUNTINGTON,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 15-2249 (JEB)** |
| **UNITED STATES DEPARTMENT OF COMMERCE,** | |
| **Defendant.** | |

**MEMORANDUM OPINION**

An attorney in the field, Plaintiff R. Danny Huntington seeks information about a defunct confidential program of the U.S. Patent and Trademark Office, which is housed in the Department of Commerce. This program – the Sensitive Application Warning System (SAWS) – was used to flag certain patent applications as involving particularly sensitive subject matter. To gain insight into the SAWS Program, Plaintiff filed multiple Freedom of Information Act requests with Commerce and subsequently brought this suit. After a previous round of summary-judgment briefing, in which the Court granted in part and denied in part both sides' motions, Defendant was ordered to resolve several deficiencies in its search.

Believing it has now fulfilled those obligations, Commerce renews its Motion for Summary Judgment. Plaintiff responds with his own Cross-Motion, arguing that Defendant's actions are still insufficient. The Court concludes that an issue of material fact exists as to whether the government conducted an adequate search within one office, but it finds that the USPTO has otherwise satisfied FOIA's dictates. The Court will, therefore, once again grant in part and deny in part each party's Motion.

1

I.      **Background**

The Court's prior Opinion lays out the full details of this controversy, see Huntington v.

U.S. Dep't of Commerce (Huntington I), No. 15–2249, 2017 WL 211301, at *1-3 (D.D.C. Jan.

18, 2017), so they will be only briefly recapped here.

Traditionally, patent applications submitted to the USPTO are reviewed for compliance

with legal requirements that, if met, result in the grant of the patent.  See ECF No. 14-4

(Declaration of John Ricou Heaton), ¶¶ 19-20.  In 1994, the Office introduced its new SAWS

program.  Id., ¶ 21.  SAWS "allow[ed] patent examiners to alert leadership when a patent might

issue on a sensitive matter," and the program "was integrated" into the regular patent-application

review process.  Id.  Inclusion in the SAWS program did not determine whether an application

would ultimately be granted or denied, see ECF No. 18-1 (Supplemental Declaration of John

Ricou Heaton), ¶ 9, but could trigger "an internal quality assurance check."  Heaton Decl., ¶ 22.

If it was granted, a report describing the invention and its sensitive nature would be sent to a

Technology Center Director, who would decide whether the Commissioner for Patents Office

should be notified.  Id.  That an application had been flagged for SAWS review was never

disclosed to the applicant or the public, as the agency believed that doing so risked coloring the

public's view of the application and giving rise to "unjustified inferences as to the issued patent's

strength and weakness."  Id. (citation omitted).  The USPTO retired the SAWS program in

March 2015.  Id.

During the first half of 2015, Huntington submitted several FOIA requests to the USPTO

seeking records related to SAWS.  After Commerce released some documents in part, see ECF

No. 11-4, Exh. 2-2 at B002, and Huntington filed multiple unsuccessful administrative appeals,

id., Exhs. 2-3, 2-4, he brought this suit in December 2015, alleging that Defendant had failed to

both conduct an adequate search and produce responsive records.  <u>See</u> ECF No. 1 (Complaint),

¶¶ 34-43.  The USPTO then undertook "a more thorough subsequent search," Heaton Decl., ¶ 23,

and released 4,114 pages and five spreadsheets of material, of which one document was redacted

in full and 132 pages were redacted in part pursuant to FOIA Exemptions 3, 5, and 6.  <u>Id.</u>, ¶¶ 44-

50.

Contending that Defendant's search remained inadequate and that certain records were

improperly withheld, Huntington moved for summary judgment.  <u>See</u> ECF No. 11 (Plaintiff's

First Motion for Summary Judgment).  Defendant, conversely, believed it had satisfied its FOIA

obligations and thus cross-moved for summary judgment.  <u>See</u> ECF No. 14-2 (Defendant's First

Motion for Summary Judgment).  In that round of briefing, there were two issues in dispute: (1)

the adequacy of the USPTO's search for responsive records, and (2) the propriety of its

withholding certain records in whole or in part pursuant to Exemption 5.

The Court concluded that Defendant's search was inadequate for three reasons.  First, the

agency's account of its search was "facially flawed" because it did not "assert[] that [it had]

searched all locations likely to contain responsive documents."  <u>Huntington I</u>, 2017 WL 211301,

at *5-6 (quoting <u>Bartko v. DOJ</u>, 167 F. Supp. 3d 55, 64 (D.D.C. 2016)).  Second, the

"description of [Defendant's] search lack[ed] the requisite specificity" because it did "not

constitute '[a] reasonably detailed' description of 'the type of search performed.'"  <u>Id.</u> at *7

(quoting <u>Oglesby v. Dep't of Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990)).  The descriptions

omitted, <i>inter alia</i>, how many laptops and emails were searched, why the locations searched

were chosen, and why no paper files had responsive records.  <u>Id.</u>  Finally, the Court determined

that Defendant should have searched the records of the Patent Trial and Appeal Board (PTAB)

Chief Judges given evidence suggesting that these judges would have responsive records.  Id. at

*10.

As to its withholding, the USPTO initially asserted Exemption 5 with respect to 49

documents.  See Def. Mot. at 21; Heaton Decl., ¶ 55.  The Court upheld Defendant's reliance on

this exemption.  Huntington I, 2017 WL 211301, at *11.

Partially granting and partially denying these first motions for summary judgment, the

Court ordered Defendant to: (1) fix the facial deficiency regarding its description of its search,

(2) describe its search in further detail, and (3) search the PTAB Chief Judges' records.  In

response, the USPTO has cured the facial deficiency, explained in more detail the search of

various offices, and searched the PTAB Chief Judges' records. Contending that it has carried out

the Court's Order and thus fully complied with FOIA, Defendant renews its Motion for

Summary Judgment.  See ECF No. 22 (Defendant's Second Motion for Summary Judgment).

Believing that Defendant's search remains inadequate and that a certain record is still improperly

withheld, Huntington renews his Cross-Motion.  See ECF No. 23-1 (Plaintiff's Second Motion

for Summary Judgment).  Both are now ripe.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott

v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248.  "A party asserting that a

fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts

of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In the event of conflicting evidence on a material issue, the Court is to construe the conflicting evidence in the light most favorable to the non-moving party. See Sample v. Bureau of Prisons, 466 F.3d 1086, 1087 (D.C. Cir. 2006).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). In a FOIA case, a court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" DOJ v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

## III.    Analysis

Bearing some similarity to the last round of briefing, the disputes here center on: (1) the adequacy of the USPTO's search for responsive records, and (2) the validity of its withholding of one document pursuant to Exemption 5. The Court considers each in turn.

A.    Adequacy of Search

In assessing whether Defendant has "demonstrate[d] beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents'" and thus has "fulfill[ed] its obligations under FOIA," Valencia-Lucena v. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)), the Court considers the three outstanding issues discussed in its prior Order: (1) whether the agency has resolved the threshold error in its account of its search; (2) whether it has reasonably described the search performed; and (3) whether it searched the PTAB Chief Judges' records. Huntington I, 2017 WL 211301, at *6, 8, 10.

1.    *Facial Deficiency*

The Court determined in its previous Opinion that Defendant's description of its search was facially flawed. Commerce has now cured this deficiency. To satisfy the dictates of FOIA, an agency must, at a minimum, "aver that it has searched all files likely to contain relevant documents." Am. Immigration Council v. Dep't of Homeland Sec., 21 F. Supp. 3d 60, 71 (D.D.C. 2014) (emphasis added) (quoting Am. Immigration Council v. Dep't of Homeland Sec., 950 F. Supp. 2d 221, 230 (D.D.C. 2013)). As the D.C. Circuit explained in Oglesby, while an agency need not search every one of its record systems, a "reasonably detailed affidavit . . . averring that all files likely to contain responsive materials . . . were searched[] is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment." 920 F.2d at 68.

"Where the government has not made such an attestation, courts have typically found that an issue of material fact exists as to the adequacy of the search." Am. Immigration Council, 21

F. Supp. at 71 (quotation omitted).  In <u>Jefferson v. Bureau of Prisons</u>, No. 05-848, 2006 WL

3208666 (D.D.C. Nov. 7, 2006), for example, the court found the FBI's search inadequate

because its declaration did not "aver that the FBI searched all files likely to contain responsive

records."  <u>Id.</u> at *6; <u>see also</u> <u>Bonaparte v. DOJ</u>, 531 F. Supp. 2d 118, 122 (D.D.C. 2008) (same);

<u>Maydak v. DOJ</u>, 362 F. Supp. 2d 316, 326 (D.D.C. 2005) (same).

      Here, in response to the Court's Order, Defendant asserts that it "has searched all

locations likely to contain responsive documents," Def. 2d MSJ at 4 (citing Second Suppl.

Heaton Decl., ¶ 22), thus invoking "the 'magic words' concerning the adequacy of the search."

<u>Bartko</u>, 167 F. Supp. 3d at 64.  The pothole is now patched.

      2.    *Search Description*

      Moving to the next issue, the Court, in its previous decision, agreed with Plaintiff's

argument that "Defendant's description of its search lack[ed] the requisite specificity."

<u>Huntington I</u>, 2017 WL 211301, at *7.  Huntington had identified several portions of the first

declaration of John Ricou Heaton, an Associate Counsel for the Office of General Law and a

FOIA officer at the USPTO, which did not constitute "reasonably detailed" descriptions of "the

type of search performed."  <u>Oglesby</u>, 920 F.2d at 68.  These included Defendant's "description

of the search undertaken in the Office of Patent Training, [and] email searches undertaken in the

nine Technology Centers, the Office of Patent Legal Administration, the Office of Patent

Training, the Office of the Deputy Commissioner for Patent Examination Policy, and the Patent

Trial and Appeal Board."  <u>Huntington I</u>, 2017 WL 211301, at *7.  Commerce's vague

descriptions left the Court uncertain as to how many emails and work laptops were searched,

why those materials but not others were determined to be reasonably likely to contain responsive

records, and how Defendant had concluded that no paper files contained responsive records.  The

agency was thus tasked with putting some meat on the bones of its search description.  Id. at *8.

In response to the Court's Order, Defendant provided an additional declaration from

Heaton describing the searches in further detail and specifically addressing which "work laptops

and emails" were searched, "reasons for [certain search] locations and not others, and how the

[USPTO] determined that no paper files had responsive records."  Def. 2d MSJ at 10.  He

explains, for example, that multiple locations were searched pursuant to Plaintiff's several

requests: "the Technology Centers ('TCs'), the Office of Patent Legal Administration ('OPLA'),

the Office of Patent Training, the Office of the Deputy Commissioner for Patent Examination

Policy, and the Office of the Commissioner for Patents itself."  ECF No. 22, Exh. 2 (Second

Supplemental Declaration of John Ricou Heaton), ¶ 9.  "John LeGuyader, a TC director who had

been the SAWS Program Lead for Patents since 2006," assisted in identifying these locations as

"reasonably likely to have records responsive to Plaintiff's FOIA requests" since "he had overall

responsibility for managing the SAWS Program and was familiar with its operation."  Id.

The Court here sets forth more specifics from Heaton's description of Defendant's search

of all offices except the PTAB, which is described in Section III.A.3, *infra*.  Heaton first detailed

the search done in the Technology Centers.  All TC directors were tasked with "[identifying]

employees within their organizations who should search for records" as they "operate and

administrate the TCs and would know the employees who participated in the SAWS Program

and would be reasonably likely to have responsive documents."  Id., ¶ 10.  Of the 26 employees

identified as likely to have responsive documents, only five were TC Directors "and twenty-one

were SAWS Points of Contacts (SAWS POCS)."  Id.  These employees searched "their work

laptops, emails, and paper records, if they had any."  Id.  The "SAWS POCS . . . helped run the

SAWS Program" and "would have performed duties such as updating and distributing SAWS guidance to TC personnel and tracking . . . applications flagged for" SAWS.  Id.  Heaton also explained that "the search for records in the TCs . . . included the search by the CSI Office of the electronic files of two former USPTO employees," a former "SAWS Program Lead for Patents," and a former "TC Director."  Id., ¶ 11.

Second, Heaton explained the search in OPLA.  Nine individuals, "the Director of OPLA and eight attorney legal advisors," who were identified by the Director as having worked on SAWS-related matters, "searched their work laptops, emails, and any paper records they may have had."  Id., ¶ 12.  Additionally, a former director of OPLA "was identified as a person to search for records within" the Office of the Deputy Commissioner for Patent Examination Policy (ODCPEP), of which OPLA is part.  Id., ¶ 14.  "[A]s a former director of OPLA, he had managed an office [with] involvement in the SAWS program."  Id.  He "searched his work laptop, emails, and paper records" in 2015 and provided to Plaintiff all responsive records found.  Id.  No one else searched ODCPEP as no other employee was identified as reasonably likely to have responsive records.  Id.

The search in the Office of Patent Training (OPT) was conducted by "the Deputy Director and a Management Program Analyst."  Id., ¶ 13.  The Deputy Director was "previously . . . a SAWS POC at a TC and was familiar with the training curriculum maintained by OPT," which included "training material about SAWS."  Id.  The Director "identified [the] Management Program Analyst who managed training materials . . . [,] which had previously included training materials about the SAWS program."  Id.  Both employees "searched their work laptops and emails but neither identified any paper records" related to SAWS.  Id.

Finally, Heaton indicated that two Advisors to the Deputy Commission for Patent
Operations, who were identified as reasonably likely to have records by the SAWS Program
Lead, searched their records in the Office of the Commissioner for Patents.  Id., ¶ 15.  No one
else in the office "had been involved in the SAWS program."  Id.  "Both . . . individuals searched
their work laptops and emails," but did not search paper records as they had only handled
SAWS-related material in electronic format.  Id.

Notwithstanding these detailed explanations of the steps taken in each division or office,
Plaintiff contends that "defendant ignored [the Order for a detailed search description] by silence
and distractions."  ECF No. 28 (Pl. 2d Reply) at 4.  On the contrary, he is the one who offers no
evidence to show that these supplemental descriptions are not enough.  The Court, consequently,
is satisfied that Heaton's declarations now describe Defendant's search in sufficient detail.  This
issue is now closed.

Even if the search description is sufficient, Huntington still challenges the adequacy of
the search itself, specifically in relation to the TCs.  See Pl. 2d MSJ at 3-4; Pl. 2d Reply at 6-7.
He first takes issue with the number of employees tasked with searching records, arguing that all
employees in every TC should have carried out searches.  See Pl. 2d MSJ at 4; Pl. 2d Reply at 6.
As previously mentioned, five out of nine TC Directors searched their records, in addition to 21
SAWS POCs located amongst the nine TCs.  See Second Suppl. Heaton Decl., ¶ 10.  Plaintiff
argues that the search must be inadequate, asserting without evidence that because "all TC
Directors had identical role[s] under the SAWS program," they must all be required to search.
See Pl. 2d Reply at 6.  He also maintains that Heaton "does not explain why some TC Directors .
. . were not identified as likely to have responsive records" and that Defendant's "claim of [an]
adequate search is unreasoned and therefore unavailing."  Id.  Finally, Plaintiff contends that all

Supervisory Patent Examiners (SPEs) should search because "it is likely that some of the TC employees who did not . . . search[] had been in the TCs before 2006." Id. at 7. This conclusion relies on the assumption that because produced responsive records from before 2006 are sparse, more must exist, and thus additional employees should be made to search. Id.

These protests, however, are belied by Heaton's aforementioned second supplemental declaration, in which he convincingly describes why only certain employees were chosen to carry out searches and why this was sufficient. See Second Suppl. Heaton Decl., ¶ 10. The "presumption of good faith" accorded to an agency's affidavits and declarations describing its search "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)). Plaintiff may hypothesize, for example, that all TC Directors participated substantively in the SAWS Program and must have responsive records or that other employees must have records because what has been produced to date is thinner than desired. As shown, however, Plaintiff offers no evidence to support those or other suppositions, without which the Court cannot infer an inadequate search.

Huntington next makes a general argument that because the USPTO has uncovered few responsive emails, its searches (not limited to TCs) must be inadequate. He requests "a sworn declaration by a PTO records management official on the availability and preservation of records responsive to the FOIA requests" "[i]n view of Heaton's unreliable testimony." Pl. 2d MSJ at 8. The basis for this position rests on Heaton's supposedly insufficient description of the USPTO's email-archival system. Id., at 8-9. Relying on an internal manual and Heaton's declarations, Huntington asserts that "it is clear that a system for preserving some emails must exist, either in

'an electronic record keeping system,' or 'printed to paper and retained in a paper filing system.' Neither comports with Heaton's account that 'there is no archived version of agency emails as they existed on some past particular date, whether in 2010, 2006, 2002, 1998 or other year.'"  Pl. 2d MSJ at 7 (citations omitted).  Citing Heaton's description in his first supplemental declaration of Defendant's email-archival system, Huntington contends that either Defendant has violated the Federal Records Act or Heaton is lying about the extent to which Defendant's emails are archived.  Id. at 6-7.

In his supplemental declarations, Heaton clarifies the USPTO's practices regarding the archiving of emails, noting that the declaration excerpts cited by Plaintiff were merely explaining that "other than the weekly and daily backup tapes, there [is] no separate archived version of emails" on backup tapes.  See Suppl. Heaton Decl., ¶ 6-7; ECF No. 27, Exh. 2 (Third Supplemental Declaration of John Ricou Heaton), ¶ 11.  Defendant then explains that emails are preserved using only "the Microsoft Office 365 cloud or PST files on network drives or laptops," and that "[e]mails can remain in the . . . cloud or . . . on network drives or laptops for many years," evidenced by the email records provided to Plaintiff.  See Third Suppl. Heaton Decl., ¶ 12.  The USPTO's search of emails is thus adequate.

In sum, Defendant has sufficiently addressed the deficiencies in its original description of its searches.  Heaton's second and third supplemental declarations, which explain the scope and method of those searches "in reasonable detail," Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982), contain the "requisite specificity" this Court determined was initially lacking.  Huntington I, 2017 WL 211301, at *7.  In both the descriptions and the searches themselves, the USPTO has now complied with FOIA.

3.    *Search of the PTAB*

In addition to resolving the facial deficiency of its explanation and providing a

supplemental description of the extent of its search, Defendant was tasked to search the records

of the PTAB Chief Judges.  Huntington I, 2017 WL 211301, at *10.  In his first declaration,

Heaton vaguely described the search of records belonging to the PTAB and its administrative

patent judges (APJs), see Heaton Decl., ¶ 41, and also asserted that the PTAB Chief Judges

"were not reasonably likely to have records responsive to Plaintiff's FOIA requests."  Suppl.

Heaton Decl., ¶ 4.  Because the records of the Chief Judges had apparently not been searched at

all and the search of APJ records had been poorly described, the Court ordered that Defendant

rectify its omissions.  Huntington I, 2017 WL 211301, at *7, 10.  As to the Chief Judges, the

Court believes Defendant has now complied with FOIA.

Heaton's two supplemental declarations explain the steps the USPTO took to search for

responsive records in the PTAB.  See Second Suppl. Heaton Decl., ¶¶ 4-6, 15-16; Third Suppl.

Heaton Decl., ¶ 3.  First, in response to the Court's Order to search "the PTAB Chief Judge's

records and computers," Huntington I, 2017 WL 211301, at *10, Heaton identified the Cyber

Security Office (CSI Office) as being "the office that would maintain such records for [those of

the judges who had] departed."  Second Suppl. Heaton Decl., ¶ 4.  There have been five different

Chief Judges of the PTAB since 1994, and only one is still serving at the PTAB (as an APJ).  Id.,

¶ 3.  Personnel searched for but did not find any emails or imaged copies of work laptops for four

of the former Chief Judges.  Id., ¶ 4.  The CSI office "did have emails and an imaged copy of the

work laptop for [one of the] former Chief Judge[s]," and these files were searched using certain

keywords.  Id.

13

The agency also searched for paper records of the former Chief Judges, but none was found.  Id., ¶ 5.  To locate this material, the USPTO contacted the Deputy Chief Judge of the PTAB, the former Confidential Assistant for Chief Judge Smith (the most recent former Chief Judge), and the Administrative Management Specialist for the PTAB.  Id.  These individuals were consulted as those "who might . . . be knowledgeable about the current existence or location of paper records."  Id.  The Solicitor and Deputy General Counsel for Intellectual Property Law at the USPTO was also contacted as he had served as acting Chief Judge of the PTAB for a brief period, and "he confirmed that he had not received any paper or electronic records from Chief Judge Smith."  Id.  The most recent PTAB Chief Judge is still with the USPTO serving as an APJ.  Id., ¶ 6.  He "searched his emails and work laptop" using certain keywords and also "searched his paper records," resulting in the locating of sixteen pages of documents.  Id.

Finally, in addition to the search of former Chief Judges' records, a former SAWS POC at the PTAB, as well as two previous PTAB judges, searched their work laptops and emails, and all records they found were turned over.  Id., ¶ 16.  The two former judges also searched their paper records and found nothing, while the former POC had no paper records to search.  Id.

Given this agency diligence, Plaintiff no longer argues that the search of the PTAB Chief Judges' records was insufficient, but he instead contends that this Court's previous decision was not limited to the Chiefs.  See Pl. 2d Reply at 4.  He interprets this Court's Order as requiring Defendant to search the records of "every other [administrative patent] judge of the PTAB."  Pl. 2d MSJ at 5 (emphasis added).

The Court agrees with Huntington's interpretation and acknowledges that it should have been more explicit in its prior Opinion with regard to Defendant's obligations.  Heaton's first

declaration indicated that "administrative patent judges[] identified work laptops and emails as locations where SAWS records would be stored," Heaton Decl., ¶ 41, but it did "not make clear how many personnel did so, what their positions were, or why those accounts were searched but others were not."  Huntington I, 2017 WL 211301, at *7.  It was thus insufficient.  Following the Court's Opinion, Commerce submitted Heaton's second declaration, which, as just mentioned, briefly describes the searches made by two former APJs.  See Second Suppl. Heaton Decl., ¶ 16. Heaton indicates that "[t]he Deputy Chief Judge identified the personnel who should search for records based on his knowledge of PTAB," but never mentions the search of the APJs.  Id. Additionally, Heaton states that the "USPTO has no basis for believing that APJs, independent of the Chief Judge and the other PTAB personnel who have already searched for records, are reasonably likely to have responsive records," but provides no explanation of why this is so.  See Third Suppl. Heaton Decl., ¶ 4.  This description remains problematic.

According to Heaton's supplemental declarations, it appears that the only APJ who looked for records was a former Vice Chief Judge; in other words, no APJs who were not Chief Judges in some capacity were included.  The countervailing evidence submitted by Plaintiff, however, see ECF 11-12, Exh. 10 at 1, Pl. 2d Reply at 5, and cited by the Court in its previous Opinion, suggests that people other than the Chief Judges saw SAWS reports.  Huntington I, 2017 WL 211301, at *10.  The Court pointed out that "earlier emails submitted by Huntington . . . suggest[ed] that SAWS reports were in fact sent to the Board of Patent Appeals and Interferences (the precursor to the PTAB) and that the Board was to be alerted when an appeal involved a SAWS application."  Id. (citations omitted).

Moving forward, Defendant may either submit an additional declaration describing in detail the search made by certain APJs and a sufficient explanation of why more APJs did not

search, or the USPTO must search all APJs SAWS-related records and provide a description

thereof.

      B.    <u>Exemption 5</u>

In addition to his concerns regarding Defendant's search, Plaintiff asks the Court to

reconsider its decision, pursuant to FOIA Exemption 5, affirming Defendant's withholding in

full of a document listing the filing dates of applications included in the SAWS program.

Federal Rule of Civil Procedure 54(b) provides that "any order or other decision . . . that

adjudicates fewer than all the claims . . . may be revised at any time before the entry of a

judgment adjudicating all the claims."  To give Huntington the benefit of the doubt, the Court

considers the claim on its merits.

In its previous decision, this Court determined that the relevant document was properly

withheld under Exemption 5's deliberative-process privilege.  <u>Huntington I</u>, 2017 WL 211301, at

*12.  Plaintiff now asks the Court to at least require Defendant to release all segregable, non-

exempt material listed on this document.  <u>See</u> Pl. 2d MSJ at 11; Pl. 2d Reply at 10.

The document at issue lists the filing dates, sorted by Technology Center, for applications

included in the SAWS program.  <u>See</u> Suppl. Heaton Decl., ¶ 12.  It was withheld because the

USPTO believes that disclosure of the dates alone could lead someone to figure out which

applications were flagged for SAWS.  <u>See</u> Heaton Decl., ¶¶ 55, 57-58 & Exh. T (<u>Vaughn</u> Index).

More specifically, a number of SAWS applications were submitted on low-volume days – <i>i.e.</i>,

days on which four or fewer applications were received.  <u>See</u> Suppl. Heaton Decl., ¶ 12.

Between fiscal year 2010 and the present, there have been 402 days on which individual

Technology Centers received only one patent application, 592 days on which they received only

two, and 1,395 days on which they received only three or four.  <u>Id.</u>; Third Suppl. Heaton Decl., ¶

16.  The release of the date information, according to Defendant, would enable the public to identify applications that were filed on low-volume days; since Technology Center and filing-date information is publicly available, anyone could compare it with information in the withheld document to determine at least some patent applications flagged for SAWS.  See Suppl. Heaton Decl., ¶ 12; Third Suppl. Heaton Decl., ¶ 16.

In response to the USPTO's initial withholding, Huntington claimed that its rationale was too speculative.  See Pl. 1st Reply at 19-20.  The Court disagreed.  Huntington I, 2017 WL 211301, at *12.  Plaintiff now contends that the Court "has patently misunderstood [the defendant]," Pl. 2d Reply at 10 (quoting Fed. R. Civ. P. 54(b)), arguing that "defendant's reasoning [for withholding the document] was inaccurate and misleading."  Id.  He seeks release of the document with the following edits: 1) the filing-date information of the applications filed on low-volume days may be redacted, and 2) the low-volume-day filing-date information may be replaced with the week in which the application was filed.  See Pl. 2d MSJ at 10.

Defendant rejoins that the document at issue "could not be meaningfully redacted in the manner proposed by Plaintiff."  Def. 2d Reply at 9.  Redacting the low-volume-day application information would create gaps in the chronologically organized table.  Id.  These gaps could be used to determine which patent applications were flagged for SAWS, thereby revealing the redacted information.  Id.

Plaintiff next slightly modified his request, asking Defendant to create two separate documents.  See Pl. 2d Reply at 9-10.  One would include only the low-volume-day application information with the filing-date replaced by the week in which the applications were filed.  Id.  The other would contain all information except the redacted low-volume-day application

information.  Id.  Huntington argues that this will resolve the problem raised by Defendant.  Id. at 10.

FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained."  Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 152 (1980).  As such, Defendant is not obligated to construct the separate documents requested by Plaintiff.  Even if this proposal did not entail the creation of a separate document, Defendant's rationale for not consenting remains sound, as neither solution raised by Plaintiff resolves the original problem of revealing information about which applications were flagged for SAWS.  The agency here submits a declaration explaining its rationale for withholding the document at issue:

> [T]he release of . . . filing dates by [Technology Center] for patent applications in the SAWS program . . . could be used to identify particular patent applications on days when there was a low volume of patent applications filed.  Further, the document cannot be meaningfully redacted without revealing information that should be protected from release.  If the document was released with redactions, any redacted filing date would be bracketed by unredacted filing dates such that the time period containing the redacted filing date would thus be revealed.  A comparison then could be done of that time period against public data reflecting the filing dates for published patent applications in order to identify the patent applications that fell within the redacted time period.  From that information, the public could determine which patent applications had been filed in the [Technology Center] on low volume days during the time period in question to speculate about and identify the application that had been in the SAWS program.

Third Suppl. Heaton Decl., ¶ 16 (citations omitted).

This declaration provides a sufficient explanation.  Despite his ingenuity, it is hard to see how either of Plaintiff's solutions resolves the problem raised by Defendant.  A gap will be created by the deletion of all the low-volume-day application information just as if only the filing date were redacted.  Defendant correctly points out that this gap could "risk revealing the very

18

information being redacted," which could "undermine [its] [legitimate] concern about stigmatizing any particular application by indicating whether or not it has been included in the SAWS program."  Def. 2d Reply at 9-10; <u>see</u> Third Suppl. Heaton Decl., ¶ 16.  The same issue of using this information to identify "patents flagged for the SAWS program prior to allowance" continues to exist, <u>Huntington I</u>, 2017 WL 211301, at *12, illustrating how the non-exempt and exempt information is "inextricably intertwined."  <u>Mead Data Cent., Inc. v. U.S. Dep't of Air Force</u>, 566 F.2d 242, 260 (D.C. Cir. 1977).  Defendant provided a detailed justification of withholding the information Plaintiff seeks, and the Court will not alter its decision as to this document.

**IV.      Conclusion**

For the foregoing reasons, the Court will grant each side's Motion in part and deny it in part; a contemporaneous Order will so state and will require consultations between the parties for a further briefing schedule on the APJ issue.

<u>*/s/ James E. Boasberg*</u>
JAMES E. BOASBERG
United States District Judge

Date:  <u>July 21, 2017</u>